# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| MELANIE BRINER, et al., | ) | CASE NO. 1:07CV129 |
| | ) | |
| PLAINTIFFS, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| THE CITY OF ONTARIO, et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |

Before the Court are several motions filed by the parties:[1] (1) Defendant Timothy McClaran's motion for summary judgment (Doc. No. 55, as supplemented by Doc. No. 105);[2] (2) Plaintiffs' motion for partial summary judgment against Defendant McClaran for removal from the City towing list (Doc. No. 69);[3] (3) Plaintiffs' motion for summary judgment on their first amendment claim (Doc. No. 73);[4] (4) the motion for summary judgment of Defendants City of Ontario, Tommy D. Hill, and Dallas Stickler ("the Ontario Defendants") (Doc. No. 75, as supplemented by Doc. No. 106);[5] (5) the Ontario Defendants' motion to strike Plaintiffs' Index of

---

[1] Plaintiffs also filed a motion for oral argument and status conference. (Doc. No. 108.) The Court perceives no need for either.

[2] This motion is supported by several depositions (Doc. Nos. 57-64). Plaintiffs filed a memorandum in opposition. (Doc. No. 84, as supplemented by Doc. No. 109.) They subsequently submitted exhibits (Doc. Nos. 91-92) which appear to be in support of their various motions and other briefs. There are motions to strike all or portions of these exhibits. (Doc. Nos. 93, 96, 97.)

[3] This motion is also supported by depositions. (Doc. Nos. 65-68.) Defendant McClaran filed a response, misdesignated as a "reply." (Doc. No. 80.) Plaintiffs then filed a reply. (Doc. No. 90.)

[4] Defendant McClaran filed a response, misdesignated as a "reply" (Doc. No. 79); the Ontario Defendants also filed a brief in opposition (Doc. No. 83). Plaintiffs filed a reply. (Doc. No. 98.)

[5] Plaintiffs filed a response. (Doc. No. 86, as supplemented by Doc. No. 109.) They subsequently filed a set of exhibits.

Exhibits and Exhibits (Doc. No. 93);[6] and (6) Defendant McClaran's motions to strike the affidavits of Melanie Briner and Thomas Briner (Doc. Nos. 96, 97).[7] The parties also filed joint stipulations of dismissal of Defendant Charles Au with prejudice (Doc. No. 77) and Defendants Richard Bevier and Riley E. Snavely without prejudice (Doc. No. 78).

## I.

## FACTUAL BACKGROUND [8]

Plaintiffs Thomas and Melanie Briner, residents of Richland County, Ohio, reached a point in their lives where they wanted to change their work situations and fulfill a dream of owning their own business and working it together. Mr. Briner had many years of experience in towing and repossession work, as well as private investigation. Mrs. Briner had been a legal secretary for 20 years, until tendinitis made her clerical duties too difficult. (Compl. ¶¶ 8-9.)

---

(Doc. Nos. 91-92.) There are motions pending to strike all or portions of these exhibits. (Doc. Nos. 93, 96, 97.) The Ontario Defendants filed a reply. (Doc. No. 100.)

[6]  Plaintiffs filed a response to this motion. (Doc. No. 94.)

[7]  These affidavits are included in the Exhibits submitted by Plaintiffs. Plaintiffs filed a combined response to these motions. (Doc. No. 109.)

[8]  The facts of this case are not marshaled very effectively in any of the parties' briefs. Therefore, the Court has gleaned the facts as best it can from the First Amended Complaint (hereafter "Complaint") and the various depositions and affidavits that have been filed by the parties.

When the Court cites to depositions, it uses the actual transcript page numbers, not the header pages that are applied by the Clerk's electronic filing system (e.g., "[Name] at [page]"). However, the deposition of Melanie Briner must be treated differently. First, it is filed in two parts -- Doc. No. 63 and Doc. No. 64. Second, both of these deposition transcripts bear page numbers that are incomprehensible in that both transcripts have *two* page numbers on each page, one at the top right of the page and a different one at the bottom center, *in addition to* the page number applied by the electronic system. Although the electronically applied "header" actually shows up about three inches from the top of each page (superimposed on transcript print), it is still the most easily identified page number. Therefore, when citing to Melanie Briner's deposition, the Court will use this form: "Doc. No. [A] at [B]," where "A" is the document number (63 or 64) and "B" is the electronically imposed page number.

In early 2004, Plaintiffs found a business opportunity in the form of a successful local towing business known as F&W Towing.[9] Although the business had operated successfully for 40 years, the owner was retiring and planning to close. Plaintiffs obtained financing and bought the business, each quitting their jobs to do so. They got all the proper permits and licenses and took over this profitable enterprise, receiving positive publicity in the local media for doing so. Plaintiffs were successful in this business and employed about 15 people. (Compl. ¶¶ 10-12.)

On December 20, 2004, F&W Towing was burglarized. Someone turned off the alarm and entered in the middle of the night, leaving with $2,000 from the cash drawer in Mrs. Briner's inner office. From the nature of the theft, Plaintiffs suspected a person named Billy Hamm, a recently terminated employee.[10] Plaintiffs reported the theft to the Ontario police and found the officers who initially responded very friendly and professional as they conducted their investigation. These officers reported Plaintiffs' suspicions about Hamm to Defendant Detective Snavely; they also provided Snavely with a list of other employees who would have had access to the keys and codes necessary to commit the crime. (Compl. ¶¶ 13-14; Snavely Dep. [Doc. No. 59] at 6-8.) Mrs. Briner told Snavely that she usually did not lock the safe, but had done so the prior evening out of fear that Hamm would come back to steal something. (Snavely Dep. at 11.)

---

[9]  The business entity was actually Weaver & Associates, Inc. d/b/a F&W Towing. As Plaintiffs prepared to purchase the business, Mrs. Briner filed the paperwork to incorporate as F&W Towing, Inc. She served as president, secretary and treasurer and Mr. Briner served as vice president. (Doc. No. 63 [M. Briner Dep.] at 9-10.)

[10]  It is not clear from the record whether Hamm was fired or quit.

Defendant Snavely immediately went to Hamm's home, but only his wife was there. Snavely left a message for Hamm to contact him and, by the time Snavely returned to the police department, Hamm was already waiting. Snavely spoke with both Hamm and his wife. Hamm reported that he had been employed by the Briners, but after a dispute over some cars he had towed, he ended his employment.[11] He denied any knowledge of or participation in the burglary; both he and his wife (who had also been employed by Plaintiffs) claimed he had been home all evening. Plaintiffs continued to believe that Hamm and his wife had been responsible for the burglary. Hamm eventually moved out of state and Snavely closed the investigation, never having solved the burglary. (Compl. ¶ 15; Snavely Dep. at 10-12.)

Plaintiffs were very unhappy about Snavely's investigation of the burglary. They were even more annoyed when Ontario police officer Don Wallace subsequently accompanied Hamm and his wife to F&W Towing to pick up some sort of pay records. Plaintiffs went to the police station on January 25, 2005, and asked to speak with Defendant Chief McClaran about the incident. (Doc. No. 63 at 77-79.)[12] McClaran explained to them that this is called a "civil standby" and it is done to ensure that a potentially volatile situation does not get out of control. The officer is not there in any kind of enforcement capacity. (McClaran Dep. [Doc. No. 50] at 229; Doc. No. 63 at 81-82.) Mrs. Briner admitted that she had no complaints about the way Officer Wallace had handled the situation. (Doc. No. 64 at 1.)

---

[11]  Hamm told Snavely that, while he was on the job for F&W Towing and in the process of changing a flat tire for a lady who had roadside assistance insurance, the lady told him that she had two other cars at her home which he could have if he could tow them away. Hamm allegedly telephoned Plaintiffs to get permission to use the tow truck for this purpose. Hamm told Snavely that when Plaintiffs later learned the value of one of the two vehicles, they wanted Hamm to relinquish them and he refused. This made him want to terminate his employment. (Snavely Dep. at 9-10.)

[12]  This was actually the first time Mrs. Briner had ever met Chief McClaran. (Doc. No. 64, at 9.)

4

Another source of conflict between Plaintiffs and the police department occurred in late 2004. Plaintiffs had employed Larry Paone ("Paone") for a couple months as a tow truck driver. Paone's father, Dave, owned a local vehicle dealership. Paone wanted to start his own towing business and was interested in trading a 1993 GMC truck for two of Plaintiff's older tow trucks (1987 and 1990). The truck exchange was made on December 1, 2004 (Doc. No. 64 at 7); however, Paone claimed he could not find the title to the GMC truck and that he would have to supply it when he found it. (Compl. ¶ 17.) On December 12, 2004, Plaintiffs fired Paone when they learned he was using a company truck to drive from phone booth to phone booth making harassing telephone calls, had run up $160 in improper personal calls on a company phone, had taken $263 in company cash receipts, and had used the company credit card for personal purchases. (Compl. ¶ 18.) Paone came to F&W Towing on December 30, 2004 to deliver the title to the GMC truck. He allegedly signed it in the presence of Mrs. Briner, who notarized it. (Compl. ¶ 20.)[13] Subsequently, the Briners moved the GMC truck to their home, where they parked it out front. (Compl. ¶ 22.)

On January 25, 2005, Dave Paone telephoned Chief McClaran and advised him that he was going to the Briners to take back the GMC truck. He told McClaran that he had clear title to the truck and McClaran assured Dave Paone that the police would not interfere because it would be a civil matter. In fact, McClaran even alerted the dispatcher that, if a call came in from the Plaintiffs, the dispatcher should simply process a report because it was not a theft, but merely a repossession of a truck. (McClaran Dep. at 40, 45, 51-52; Compl. ¶ 26.) The Paones went to Plaintiffs' home, apparently when they were not there, and took back the GMC truck. (Compl. ¶ 25.)

---

[13]  This fact is disputed. Paone apparently told Defendant Snavely that he had signed the title in his father's presence and put it in the glove box of the GMC truck, in anticipation of the truck exchange, prior to taking the truck to Plaintiffs.

5

On January 25, 2005, when Plaintiffs discovered the GMC truck missing, they went to the police station with the title that Paone had allegedly signed over to them on December 30, 2004. Sergeant Richard Bevier[14] initially handled this report of a theft, but subsequently Defendant Hill took over. (Hill Dep.[Doc. No. 58] at 19.)[15] Plaintiffs showed Hill the title and he was struck by the fact that the Briners had not actually registered the transfer. Therefore, the title was still in the name of Larry Paone, the person they were alleging had stolen the vehicle. Hill testified at his deposition: "[R]ight off the bat we didn't have a typical, normal vehicle theft." (Hill Dep. at 20.) In his view, ownership would need to be proven by Plaintiffs before the police "could move forward with it." (Hill Dep. at 21.)

Hill also noticed what appeared to be alterations on the title. In particular, he noticed that a "1" on the date of delivery (December 1) had been changed to a "3" and written as December "30" and, at the bottom, a "20" that had been written in blue ink was overwritten as "30" in black ink. When Hill asked Mrs. Briner about that, she denied having made any changes. (Hill Dep. at 111-12; *see also*, Hill Aff. [Doc. No. 75-2] at 10-11.)[16]

When Hill ran the vehicle through LEADS, Larry Paone was shown as the owner. (Hill Dep. at 20-22.) Hill could not locate Paone, so he called Dave Paone at his business. It was

---

[14] The parties filed a joint stipulation of dismissal of Bevier without prejudice. (Doc. No. 78.)

[15] This report made by Plaintiffs was videotaped because it was made in the interrogation room at the police department.

[16] When questioned at her deposition, Mrs. Briner acknowledged having made these changes and having testified to that fact in a civil case she and her husband had brought against the Paones in Mansfield Municipal Court. In that proceeding, she testified, in explanation for the first change, that she had started to write "December 1" because that was the day the vehicle was delivered, but then decided she needed to write "December 30," the day she got the title. Therefore she wrote a "3" over the "1." As for the second change, she testified that she mistakenly started to write "December 29" and the overwrote the "2" as a "3" to make it the correct date, "December 30." (Doc. No. 63 at 14-16.)

then he learned that Paone and Plaintiffs had apparently agreed to a vehicle exchange but that it "somehow fell through" and "Larry had asked Dave to repossess the vehicle." (Hill Dep. at 28-29.) Hill then called Paone, who told Hill that, in anticipation of the vehicle exchange, he had signed the title and put it in the glove box of the GMC truck. (Hill Dep. at 30.) Later in the day, January 25, 2005, Dave Paone came in and showed Hill a duplicate title to the GMC truck. (Hill Dep. at 35.)

The investigation was passed off to Defendant Snavely within a couple days. (Hill Dep. at 27.) On January 28, 2005, Snavely went to the auto title office in Mansfield. He showed a supervisor the title which Mrs. Briner had given to Hill; the supervisor told him the title was void because it had been altered and because the purchase price and mileage had not been filled in. (Snavely Dep. at 63-64.) Another person in the dealer section of the title office advised him to have the original owner obtain a duplicate title and then to fill in the transfer information again. (Snavely Dep. at 64.)

Debra Hissong, an employee at F&W Towing, purportedly agreed in February 2005 to attest that she had observed Larry Paone sign the title to the GMC truck in Mrs. Briner's office on December 30, 2004. (Doc. No. 63 at 39-40; Hissong Statement, Doc. No. 75-2 at 9.) Mr. Briner took the statement (and others that are not relevant here) to the police department on February 16 or 17, 2005 and asked the dispatcher to give them to Chief McClaran. (T. Briner Dep. [Doc. No. 60] at 29, 34.) After Hill had read Hissong's statement, he recalled that Mrs. Briner had told him in her videotaped interview on January 25, 2005, that only she and Paone were in the office when the title was signed. Hill asked Hissong to come to the police department to discuss her statement. (Hill Aff. ¶¶ 11,12.) On March 10, 2005, Hill showed Hissong the videotape of Mrs. Briner's interview and Hissong then admitted both that Mrs. Briner had typed her statement and that some things in the

7

statement were not accurate. (Hill Aff. ¶ 13.) Hissong then provided another statement wherein she admitted volunteering to sign the statement Mrs. Briner had composed for her, even though she knew it contained falsehoods. (Hissong Statement, Doc. No. 75-2 at 6-8.)

On March 11, 2005, Chief McClaran sent a letter to the Plaintiffs indicating that F&W Towing was being immediately removed from the towing call out list for the City of Ontario due to "questionable conduct." (McClaran Dep. at 77, 81-82, 232; Letter, Doc. No. 68 at 1.)

Plaintiffs perceived the Ontario police department as doing nothing to get to the bottom of what they believed was a theft of the GMC truck. They approached other city officials to complain, including the Service Safety Director and the Mayor. Plaintiffs allege that Hill pressured Hissong to change her statement in retaliation for these complaints. (Compl. ¶¶ 34-35.)

Plaintiffs further allege that they were removed from the towing call out list in retaliation for their complaints, although Defendant McClaran denies this. (Compl. ¶ 38; McClaran Dep. at 232.) Plaintiffs apparently had to close F&W Towing due to the loss of business and they suffered significant and unanticipated loss of income. (Compl. ¶ 38.)

In June 2005, Plaintiffs began organizing and circulating petitions to get a proposal for a Citizen's Police Review Board on the November ballot.[17] To that end, Mr. Briner placed a sign on their property, stating "We need honest police, vote for the review board." (Compl. ¶ 42; T. Briner Dep. at 42.) He also posted a sign advertising the sale of F&W Towing. (T. Briner Dep. at 46.) Mr. Briner consulted the zoning inspector, Defendant Dallas Strickler, prior to displaying the

---

[17] Plaintiffs also sued Larry Paone in Mansfield Municipal Court alleging theft of their vehicle. That court found in favor of Plaintiffs and awarded $5,500. (Compl. ¶ 41.)

signs and was told that they were permissible political and real estate signs. (T. Briner Dep. at 45; Strickler Dep. [Doc. No. 65] at 21-22.)

At some point, Mr. Briner modified the political sign by adding content to the other side of the sign. This content was perceived by some as a personal attack on McClaran. (T. Briner Dep. at 49; Strickler Dep. at 31; McClaran Dep. at 158-59.) When McClaran saw the sign, he called the law director, Rebecca Thomas, and Defendant Strickler to make a complaint and to inquire about the legality of the sign. (McClaran Dep. at 161-62.) Strickler agreed that the modified portion of the sign was no longer political but rather a personal comment about a particular member of the police force. (Strickler Dep. at 31.) He telephoned Mr. Briner to tell him to take it down. Mr. Briner protested that, since Chief McClaran was a public figure, it was permissible to criticize him; he did not remove the sign. (T. Briner Dep. at 51, 52; Strickler Dep. at 35.) In fact, he further modified the sign and, following additional complaints, still refused to remove the modified sign, despite a threat by Strickler that he would refer the matter to the City's law director. Mr. Briner testified that he was acting on the advice of the American Civil Liberties Union ("ACLU") that he had "every right in the world to put that sign up." (T. Briner Dep. at 54-56.) There is nothing in the record to suggest that Mr. Briner ever removed any signs based on complaints or other directives to remove them.

In late August 2005, it was announced that the police review board petition had gathered enough signatures to be put on the November 2005 ballot. (Compl. ¶ 45.) Days later, on or about August 22 or 23, the prosecuting attorney approved the filing of three misdemeanor charges against Mrs. Briner: tampering with records, falsification, and complicity to commit falsification.

(Compl. ¶ 46; McClaran Dep. at 156; Hill Dep. at 7, 65; Snavely Dep. at 42.)[18] Counts One and Two were nolled (Compl. ¶ 49) and Mrs. Briner went to trial on the third claim. (Compl. ¶ 50.) On May 5, 2006, the court granted a motion to dismiss the charge following the conclusion of the prosecution witnesses. (Compl. ¶ 50.)

Plaintiffs also repeatedly took their complaints about the police department to City Council meetings. On March 2, 2006, at a City Council meeting, Mr. Briner made a statement critical of the police chief, the law director, several city officials and city police officers. (T. Briner Dep. at 67-68.) On May 18, 2006, after the charges against her had been dismissed, Mrs. Briner addressed the City Council; she was very critical of the police department and various other city officials and complained about the fact that charges had been brought against her. The Council president told Mrs. Briner that these matters were not something that Council could address. (T. Briner Dep. at 68, 71, 74, 76.) On February 1, 2007, Mr. Briner attempted to address the Council, but the Council president was concerned because Briner indicated that he would talk about the instant civil lawsuit which, at that time, had only recently been filed. The Council president told Briner he could not speak about the pending litigation and, when Briner continued to do so, the president found him out of order and had him escorted out of the room by a police officer. (T. Briner Dep. at 85, 88-89.) Finally, on February 15, 2007, both Mr. and Mrs. Briner addressed the Council with respect to the same complaints. (T. Briner Dep. at 91.)

Plaintiffs allege that, due to their complaints about the police department and their attempts to speak out about this in public, the Defendants entered into a sustained pattern of

---

[18]   Defendants Snavely and Hill had actually recommended felony charges, but the prosecutors office would only approve misdemeanor charges. (Snavely Dep. at 42.)

retaliation that resulted in false charges being filed against Mrs. Briner, the destruction of their towing business (which they were forced to close on April 21, 2006), significant business and personal losses, including medical damages, public humiliation and legal fees.

Plaintiffs filed the instant lawsuit on January 17, 2007, setting forth several claims pursuant to 42 U.S.C. § 1983, plus related state law claims. In particular, they assert the following § 1983 claims: (1) retaliation (first amendment); (2) malicious prosecution (fourth amendment); (3) deprivation of due process and property rights (fifth and fourteenth amendments); (4) conspiracy to violate constitutional rights; (5) municipal liability of City of Ontario; (6) defamation (fifth and fourteenth amendments); (7) City of Ontario's denial of Plaintiffs' right to speak at public meetings (first amendment); and (8) denial of equal protection with respect to yard signs by City of Ontario and Strickler (fourteenth amendment). In addition, they allege "supplemental state claims" in the following generic allegation: "Plaintiffs further allege that the actions of the Defendants [. . .] constitute malicious prosecution, intentional infliction of emotional distress, civil conspiracy, defamation, invasion of privacy, tortious interference with contracts, and tortious interference with business interests, under Ohio law, and further violates the Ohio Constitution." (Compl. ¶ 74.)

11

## II.

## DISCUSSION

### A.  Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law [. . .].

Rule 56(e) specifies the materials properly submitted in connection with a motion for summary judgment.

> (1) ***In General***. A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated[. . .]. The court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits.

> (2) ***Opposing Party's Obligation to Respond***. When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must--by affidavits or as otherwise provided in this rule-set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n.*, 909 F.2d 941, 943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id*. at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), *citing Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988). The non-moving party is under an affirmative duty to point out specific facts in the record upon which it relies to create a genuine issue of material fact. *Fulson v. Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id*.

13

**B.  Construing the First Amended Complaint**

The complaint, as amended by the first amended complaint, is so poorly pled that it is impossible to tell which claim is leveled against which defendant(s). For the most part, allegations are made generally against "the defendants." Therefore, the Court has had to construe the complaint for purposes of its analysis of the summary judgment motions.

**1. Claims 1 through 5, 7 and 8**

The Court construes Claims 1, 2, 3, 4, and the supplemental state law claims as being asserted against all four remaining defendants: City of Ontario, McClaran, Hill and Strickler.[19] McClaran and Strickler have been sued in both their individual and official capacities; Hill has been sued only in his individual capacity. Claims 5 and 7 are construed as asserted against only City of Ontario. Claim 8 is construed as asserted against City of Ontario and Strickler, in his individual and official capacities.

Claims 1, 7, and 8 allege, pursuant to 42 U.S.C. § 1983, first amendment violations of the right of free speech as well as retaliation for exercising that right. Claim 2 alleges, pursuant to § 1983, a fourth amendment violation in the form of malicious prosecution of Mrs. Briner without probable cause. Claim 3 alleges, pursuant to § 1983, fifth and fourteenth amendment violations in the form of deprivation of property rights without due process. Claim 4, also brought under § 1983, is a claim of conspiracy to violate unspecified constitutional rights. Claim 5 asserts that City of Ontario is liable because the various alleged constitutional violations were the result of official

---

[19]   On January 22, 2008, the parties filed joint stipulations of dismissal of Defendant Charles Au with prejudice (Doc. No. 77) and of Defendants Richard Bevier and Riley E. Snavely without prejudice (Doc. No. 78). These stipulations of dismissal are hereby **APPROVED** and these three parties are dismissed.

14

policies and customs instituted by McClaran in his official capacity as police chief, as well as a failure to adequately train, supervise and discipline its employees.

### 2. Claim 6

Claim 6 vaguely alleges in a single paragraph as follows:

<u>SIXTH CLAIM - FEDERAL DEFAMATION CLAIM</u>

> 67. The allegations against Melanie Briner of her commission of a crime while engaged in the business of F&W Towing represented an unconstitutional interference with her property interest in her business and the interests of F&W Towing protected by the Fifth and Fourteenth Amendments.

Paragraph 67 does *not* allege which of the defendants engaged in this activity; in fact, it does not even allege that *any* of the defendants engaged in this alleged activity. The paragraph begs the question: "*Who* interfered with Mrs. Briner's constitutional rights?" Notice pleading under Fed. R. Civ. P. 8(a) requires, it seems, that any individual defendant should be able to tell which claims are leveled against him or her. It is bad enough to allege that "the defendants" engaged in various behaviors; but to simply fail to allege that *any* defendant was involved in particular activity is incomprehensible.

Although they are now dismissed by stipulation, the complaint as drafted and amended swept Defendants Au, Bevier and Snavely into all of the general allegations against "the defendants." Charles Au is Ontario's Service Safety Director and Bevier and Snavely are Ontario police officers who are barely mentioned in the complaint. None of these men could have had anything to do with most, if not all, of the allegations in the complaint. This illustrates the ineffectiveness of drafting allegations against "the defendants," rather than against specifically named defendants.

15

Even if the Court were to generously construe Claim 6 as also being leveled against "the defendants," although the claim fails to mention *any* defendant, these three men would also have been swept into the allegations of that claim even though they clearly had no involvement in bringing any criminal charges against Mrs. Briner. Again, the fundamental principles of true notice pleading are illustrated.

In view of Plaintiffs' failure to plead Claim 6 with any specificity despite having filed an amended complaint, the Court hereby **DISMISSES** Claim 6.

## C.  The Motions to Strike (Doc. Nos. 93, 96, 97)

The Ontario Defendants have filed a motion to strike the entire packet of exhibits submitted by Plaintiffs,[20] arguing that the exhibits were not filed until February 12, 2008 when the deadline was February 8, 2008.[21] They assert without any support that they have been prejudiced by this late filing. Plaintiffs, in response (Doc. No. 94), argue that there was no prejudice because the information contained in the exhibits was referenced in their summary judgment briefing, putting Defendants on notice that the information was relied upon.[22]

Defendant McClaran has also filed motions to strike only a portion of the packet of exhibits, namely, the affidavits of both Plaintiffs.[23] In addition to asserting that the exhibits were

---

[20]  The exhibit packet is Doc. No. 91.

[21]  The motion does not seek to strike another untimely filed exhibit -- a cassette tape. (Doc. No. 92.)

[22]  Further, the Court notes that Plaintiffs' response to the Ontario Defendants' motion for summary judgment (Doc. No. 86) contains the index of exhibits, listing all four exhibits, with blank pages stating that each exhibit would be supplemented.

[23]  In an untimely filing on April 1, 2008, the Ontario Defendants also objected to the two affidavits for failure to comply with Fed. R. Civ. P. 56(e).

16

untimely filed, McClaran argues that both affidavits contain "conclusory self-serving statements that are inadmissible as a matter of law[.]"

The Court does not approve of the method used by Plaintiffs for "supplementing" their response to the summary judgment motions and, in fact, concludes that there was no good cause for using this method. The deadline for Plaintiffs' response brief, including all supporting documents, was Friday, February 8, 2008. Filing exhibits on Tuesday, February 12, 2008 does not satisfy this requirement.[24] Further, the Court agrees that the affidavits do not comply in many respects with Fed. R. Civ. P. 56(e).

Accordingly, the Court **GRANTS** the motions to strike set forth in Doc. Nos. 93, 96 and 97, and strikes from the record the exhibits contained in Doc. No. 91. In addition, the Court *sua sponte* strikes Doc. No. 92, a cassette tape which was also untimely manually submitted and bears no certificate of service.

---

[24] The Court also notes that, had some true emergency prevented Plaintiffs from filing the exhibits on Friday, one would think that they would have filed them at the earliest opportunity after the deadline date. Instead, the exhibits were not filed until 7:18 PM on February 12, 2008, and this was without leave of Court.

**D.  The Various Motions for Summary Judgment**

All of the remaining defendants have moved for summary judgment, although McClaran has filed a motion separate from the Ontario Defendants. (Doc. Nos. 55 and 75.) Plaintiffs have moved for partial summary judgment with respect to McClaran for his having allegedly removed them from the City's towing list. (Doc. No. 69.) They have also moved for summary judgment on all of their first amendment claims. (Doc. No. 73.)[25] Rather than deal with each motion separately, the Court will address the individual claims.

**Claim 1 (First Amendment - Retaliation)**

In their first claim, plaintiffs assert that by dropping Plaintiffs' business from the towing list and by pursuing the misdemeanor charges against Mrs. Briner, Defendants engaged in retaliation designed to discourage Plaintiffs from, and punish them for, exercising their first amendment rights to criticize the police.

The only way that pursuing criminal charges could be retaliatory would be if there had been a lack of probable cause for bringing the charges. As discussed below with respect to Claim 2, Plaintiffs are unable to show that probable cause was lacking for the prosecution and, therefore, there can be no conclusion that the prosecution was retaliatory.

As for removal from the towing list:

> [. . .] The Supreme Court has consistently held that the "government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech' even if he has no entitlement to that benefit." *Board of County Comm'rs v. Umbehr*, 518 U.S. 668, 674, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996) (quoting

---

[25]  Again, the Court notes the sloppy pleading. Claim 8 is captioned as a Fourteenth Amendment claim and mentions the First Amendment only in passing, yet Plaintiffs' motion argues this claim as if it were a first amendment claim.

*Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)). The Court explained as follows:

> [E]ven though a person has no "right" to a valuable government benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests-especially, his interest in freedom of speech.

> *Perry*, 408 U.S. at 597, 92 S.Ct. 2694. As set forth more fully in Umbehr's companion case of *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 717, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996), placement on a municipal tow rotation list is one such benefit that may not be denied a person because of his constitutionally protected speech.

*Lucas v. Monroe County*, 203 F.3d 964, 972 (6th Cir. 2000).

"To prevail on their retaliation claim, Plaintiffs must establish (i) that they were engaged in constitutionally protected conduct; (ii) that Defendants' adverse action caused them to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that conduct; and (iii) that the adverse action was motivated at least in part as a response to the exercise of their constitutional rights." *Id.* at 973.

Here there is no evidence in the record to suggest that Hill (a police officer) and/or Strickler (the zoning inspector) had anything to do with the decision to remove Plaintiffs from the towing list. Even though Plaintiffs have alleged that "the defendants" engaged in this activity, the record only supports a conclusion that Defendant McClaran made that decision. Whether the City of Ontario can be held liable for McClaran's decision is discussed under Claim 5.

McClaran testified at his deposition that he did not remove F&W Towing from the list because of Plaintiffs' criticism of the police department. (McClaran Dep. at 232.) This fact seems

19

to be supported by the letter which Plaintiffs received wherein McClaran informed them that F&W Towing was being removed from the list. There, McClaran indicated that removal was the result of "questionable conduct on the part of F&W Towing." (McClaran Dep. at 81; Letter, Doc. No. 68 at 1.) He claimed that the Mansfield Police Department had also expressed concerns with F&W Towing's handling of vehicles and that he had heard about slow response time and missing vehicles, as well as other general complaints. (McClaran Dep. at 82-84.)

Notwithstanding this testimony and the letter, the Court concludes that there is a factual dispute over whether McClaran was motivated by a desire to chill the Plaintiffs' exercise of their first amendment rights. The Court finds this dispute in the following short portions of McClaran's deposition where he was questioned about the nature of the "questionable conduct" that supposedly caused him to remove Plaintiffs' from the towing list.

> Q.  And one of the things you mentioned was, quote, some questionable conduct. That was one of your motivations in sending this letter, right?
>
> A.  Yes.
>
> Q.  What conduct were you referring to? What was the questionable conduct that you meant?
>
> * * *
>
> A.  *It was pertaining to the accusations made against us* and also our case that was pending at that time on Melanie Briner.
>
> * * *
>
> Q.  Were you referring to anything other than that [the altered title]?
>
> * * *

20

A.      *The conduct that they had towards us as a department
in our investigations.* [ . . .]

        * * *

Q.      And do you recall saying to the Briners or
communicating to them somehow that until the matter
was cleared up, the City of Ontario was no longer
going to utilize them as a towing company?

A.      That's what the letter said.

Q.      What matter were you referring to?

A.      Well, we had our issues with the title, number one.
*We had issues, or I did, at least, with my officers not
wanting to utilize them because of the way they were
treated.* So that's --

Q.      Treated by the Briners?

A.      Treated by the Briners, yes.

Q.      I see. *And in this you're referring to the attitude and
the criticisms in the past, right?*

A.      Yes.

(McClaran Dep. at 81-85, emphases added.)

        This testimony seems to suggest that Defendant McClaran was unhappy about

Plaintiffs' criticism of his department and relied on that, at least in part, as reason to remove F&W

Towing from the towing list. If that is true, then McClaran may have violated Plaintiffs' first

amendment free speech rights. Even though, as decided below, Plaintiffs had no property interest in

remaining on the towing list and could be removed for practically any reason, the reason could *not*

be because they exercised their free speech rights to publicly criticize McClaran and the police department.

Accordingly, Plaintiffs' claim that they were removed from the towing list because they exercised their first amendment right to publicly criticize McClaran and his department survives summary judgment as to McClaran and the City. Because there are material facts in dispute, a jury will have to decide this issue.[26]

### Claim 2 (Fourth Amendment - Malicious Prosecution)

In Claim 2, Plaintiffs assert that the defendants caused Mrs. Briner to be prosecuted without probable cause, in violation of the fourth amendment (and in retaliation for having exercised her first amendment rights).

As a threshold matter, according to the Court's construction of the complaint, this claim is leveled against the City, McClaran and Strickler in their individual and official capacities, and Hill in his individual capacity. There are clearly no facts in the record to suggest that Strickler, the zoning inspector, had anything to do with initiating charges against Mrs. Briner. Therefore, summary judgment in his favor on this claim is appropriate. Whether there is municipal liability will be considered under Claim 5 below. Therefore, the Court will analyze this claim only as to Defendants McClaran and Hill.

> 1. The essential elements of a malicious prosecution are: (1) malice in instituting the prosecution, (2) lack of probable cause, and (3) termination of the prosecution in favor of the defendant. (*Rogers v. Barbera* [1960], 170 Ohio St. 241, 10 O.O.2d 248, 164 N.E.2d 162, paragraph one of the syllabus, followed.)

---

[26] Because there are facts in dispute, the Court cannot *grant* Plaintiffs' motion for summary judgment on this issue. (Doc. No. 69.)

2. In an action for malicious prosecution, the want of probable cause is the gist of the action.

3. A defendant with a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense charged, meets the requirement of probable cause. However, the defendant's conduct should be measured in light of his situation and the facts and circumstances he knew or reasonably should have known at the time he filed the criminal complaint.

*Portis v. TransOhio Sav. Bank*, 46 Ohio App.3d 69, Syllabus ¶¶ 1, 2, 3 (Ohio App. 1988).

Here, there is plenty of undisputed evidence in the record to establish probable cause for the misdemeanor charges against Mrs. Briner. Defendant Hill was the officer who first encountered what appeared to be an altered vehicle title when Plaintiffs complained that the GMC truck had been stolen from them. Hill noticed handwritten changes to dates on the title, but Mrs. Briner denied any knowledge of how that occurred. Later, she admitted having made the changes to the title. Officer Hill also had concerns about the first statement made by Debra Hissong, to the effect that she had seen Larry Paone sign the title over to Mrs. Briner, because Hill recalled Mrs. Briner having been certain that no other person had witnessed it and because both Paone and his father had told Hill that they were together at another location at the time the title was supposedly being signed in Mrs. Briner's presence. When Hill called Hissong in for further questioning and learned that, not only had Mrs. Briner asked her to make the statement, she had actually typed it out for Hissong to sign, he became even more suspicious that falsification of the title may have occurred.

The test set forth in *Portis* has clearly been met. Plaintiffs are unable to establish the elements of a claim of malicious prosecution and are, therefore, also unable to sustain a claim that

the prosecution of Mrs. Briner was in retaliation for the Plaintiffs' exercise of their first amendment rights.[27] Summary judgment in favor of all Defendants on this claim is appropriate.

### Claim 3 (Fifth and Fourteenth Amendment - Deprivation of Property)

In Claim 3, Plaintiffs allege that unspecified "said acts" (presumably taking Plaintiffs off the towing list) deprived them of their substantive property rights without due process, in violation of the fifth and fourteenth amendments. This claim is brought against the City, McClaran and Strickler in their individual and official capacities, and Hill in his individual capacity.

There is no doubt from the record that McClaran made the decision to remove F&W Towing from the City's towing list. Neither Strickler nor Hill had any involvement in that decision and, therefore, summary judgment in their favor on this claim is appropriate. Whether the City can be held liable for any wrongdoing on the part of McClaran is addressed in the discussion of Claim 5.

In *Lucas v. Monroe County*, *supra*, a case with very similar facts to the instant case, the court held that there was no protected property interest in remaining on a towing list maintained by a city. The court stated:

---

[27]  The Court also notes that the decision to prosecute is made by the prosecuting attorney after the police bring the results of their investigation to the attorney. Therefore, neither Hill nor McClaran personally made the decision to prosecute Mrs. Briner. Unless there would be proof that Hill and/or McClaran purposefully falsified the investigation reports given to the prosecuting attorney, and there is no such claim, it is difficult to see how either of them could be liable for malicious prosecution. In any event, the Court need not make that decision because there clearly was probable cause for the prosecution.

"The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interest that a person has already acquired in specific benefits." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 576, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The mere unilateral expectation of continuing to receive a benefit is not enough to create a protected property interest; instead a "legitimate claim of entitlement" must exist. *Id.* at 577, 92 S.Ct. 2701. "[A] property interest exists and its boundaries are defined by 'rules and understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.' " *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 141 (6th Cir.1997) (quoting *Roth*, 408 U.S. at 577, 92 S.Ct. 2701).

In the instant case, however, Plaintiffs can point to no ordinance, contract or other "rules of mutually explicit understandings" that support their claim of entitlement to remain on the stand-by list. *See Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). The only relevant policy on record, in place since 1991, expressly states that a wrecker service will be removed from the call list upon filing a complaint with an unauthorized person. Plaintiffs' reliance on *Gregg v. Lawson*, 732 F.Supp. 849 (E.D.Tenn.1989), is misplaced. In *Gregg*, the court held that the plaintiff had a "legitimate claim of entitlement" in remaining on the wrecker tow list, on grounds that "several references to and procedures for removal or suspension from the list to compel compliance with the regulations reflect the mutual nature of the relationship established by inclusion on the list." *Id.* at 853. In this case, there are no such established "procedures" for suspension or removal. The written policies of the Sheriff's Department--however unfair they may be--explicitly provide that a wrecker company may be immediately removed from the list upon making a complaint to an unauthorized person. As a result, these policies did not create a legitimate claim of entitlement to remaining on the tow call list even after making such complaints. Accordingly, Plaintiffs' due process claim was properly dismissed on grounds that they have not established the existence of a constitutionally protected property interest.

*Lucas v. Monroe County*, 203 F.3d at 978.

Here McClaran testified that there are no particular policies in place for how one is added to or removed from the towing list. Nor is there any rotation of any sort to equitably distribute the towing assignments. Plaintiffs, in fact, were not on the general list; they were called only for AAA towing jobs.

Plaintiffs have made no effort to establish that they have a property interest. They offer only their own unilateral expectations that they would continue to be called. Although the Court has stricken the Plaintiffs' affidavits from the record as untimely filed, even if the Court had considered those affidavits, they provide no support for Plaintiffs' assertion that they had a property interest in staying on the towing list.

Since the Court concludes that Plaintiffs had no protected property interest in remaining on the towing list, their claim of deprivation of property without due process cannot stand. Accordingly, summary judgment in favor of defendants on Claim 3 is appropriate.

### Claim 4 (Conspiracy to Violate Constitutional Rights)

In Claim 4, Plaintiffs allege that all of Defendants' actions "as described above" constituted an unlawful conspiracy to violate unspecified constitutional rights. The Court has construed this claim as being leveled against City of Ontario, McClaran and Strickler in their individual and official capacities, and Hill in his individual capacity.

In view of the Court's rulings on Claims 1 through 3, the only constitutional right that *may* have been violated is Plaintiffs' first amendment right of free speech. If this was violated, it would have been only by McClaran, the sole person making the decision to remove Plaintiffs from the towing list. Although the City *might* be liable for this action on McClaran's part, Hill and

26

Strickler had no involvement in this decision. Therefore, summary judgment in favor of Hill and Strickler on Claim 4 is appropriate simply because they were not involved.

A person cannot conspire with himself. The essence of a conspiracy to violate constitutional rights is for two or more individuals to agree amongst themselves to deprive another of those rights. Here, there is no factual dispute that McClaran alone made the decision to remove Plaintiffs from the towing list. Even if the City were to be considered liable for this decision, the City and McClaran, in that context, are not separate "persons."

In view of the above discussion, Claim 4 does not survive summary judgment.

### Claim 5 (Municipal Liability)

In Claim 5, Plaintiffs allege that the City of Ontario, through Defendant McClaran, established official and unofficial customs and policies which resulted in the violation of unspecified constitutional rights. They further allege that "these events" were proximately caused by Defendants' failure to adequately train, supervise and discipline employees. Presumably, the "events" referred to are those events outlined in Claims 1 through 4. Since the Court has decided that the only issue from Claims 1 through 4 to survive is Claim 1 (the first amendment retaliation claim), the Court must also determine whether the City of Ontario can be held liable for the actions of McClaran, if a jury decides that McClaran violated Plaintiffs' first amendment rights.

A body politic is a "person" within the meaning of § 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The statute, however, does not permit a municipal entity to incur liability under a theory of *respondeat superior*. *Id*. at 691, 98 S.Ct. 2018. Rather, a municipality may be held liable under § 1983 only where its policy or custom causes the constitutional violation in question. *Id*. at 694, 98 S.Ct. 2018.

> Municipal liability may attach for policies promulgated by the official vested with final policymaking authority for the municipality. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482-83, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Whether a given individual is such a "policymaker" for purposes of § 1983 liability is a question of state law. *Id*. at 483, 106 S.Ct. 1292.

*Miller v. Calhoun County*, 408 F.3d 803, 813 (6th Cir. 2005).

There is no question that a police chief is at least one of the policy-making authorities for a city police department. Therefore, if McClaran is found liable in his official capacity, municipal liability will attach to City of Ontario.

### Claim 7 (First Amendment - Denial of Right to Speak at Public Meetings)

In Claim 7, Plaintiffs allege that, on an unspecified date in February 2007, Mr. Briner was "prohibited entirely from speaking" during the portion of City Council meetings set aside for public comment, in violation of the first amendment. This claim is leveled against only the City of Ontario.

The record reveals that there is absolutely no basis in fact for this claim. As outlined in Section I, *supra*, Mr. Briner addressed the City Council on several occasions.[28] In particular, Mr. Briner spoke to the City Council on February 1, 2007, but was stopped by the Council president when he began, inappropriately, to talk about the instant lawsuit; in fact, he was escorted out of the

---

[28] For example, on March 2, 2006, at a time that the criminal charges against his wife were pending, Mr. Briner spoke before Council and was very critical of McClaran, Hill and the City law director. He was allowed to speak for the entire three minutes of allotted time. On May 18, 2006, Mrs. Briner addressed the Council. She, too, was permitted to criticize the police department and various city officials; she even stated that Officer Hill had testified under oath that he had falsified a police report. She was stopped when she went over her three minutes. She was also told that some other matters she had attempted to raise were matters for the City administration, not the legislative body. On February 15, 2007, both Mr. and Mrs. Briner addressed the council with respect to the same complaints about the police department; although there is usually a three-minute limit for these public comments, no one stopped the Briners when they split their remarks and *each* spoke for three minutes.

meeting when he continued to speak after the Council president told him he was out of order. There is no constitutional right to disrupt city meetings by speaking out of order.

According to the undisputed facts established by Mr. Briner's own testimony, neither Mr. or Mrs. Briner was prevented from making *appropriate* public comments at City Council meetings. Therefore, summary judgment in favor of the City with respect to this claim is appropriate.

### Claim 8 (Fourteenth Amendment - Equal Protection Violation and First Amendment - Free Speech Violation)

In Claim 8, Plaintiffs allege rather inartfully that Defendants City of Ontario and Strickler violated their first amendment right of free speech in October 2005 and the summer of 2006 by requiring that they remove or alter yard signs that were critical of the police department. They further allege a fourteenth amendment equal protection claim, asserting that other similarly situated individuals were not required to remove or alter yard signs.[29]

The record reflects that McClaran asked Strickler, the City zoning inspector, to look at the signs posted in the Briners' yard to determine whether they were legal. There is no question that the signs were critical of the police department in general and McClaran in particular. Mr. Briner believed the signs were legal because McClaran was a public figure and because he had also been advised by the ACLU that he had the right to post the signs. Strickler thought that the signs had started out as legitimate political signs but, as they were changed, they degraded into personal attacks and no longer complied with City ordinances.

---

[29] Claim 8 is actually captioned solely as a fourteenth amendment violation; however, the text of ¶ 73 mentions the first amendment in passing. Therefore, the Court has construed Claim 8 as both a first and fourteenth amendment claim.

The record is clear that, although Mr. Briner was told at least twice to remove the allegedly offending yard signs, he never did so, even when told that the case would be turned over to the law director. Therefore, the Briners' first amendment right of free speech was not actually violated; they were not prevented from speaking by way of their yard signs. In other words, they suffered no first amendment injury-in-fact. Therefore, to the extent Claim 8 attempts to set forth a first amendment claim, it must be dismissed for lack of justiciable injury.[30] *See*, *Morrison v. Board of Educ. of Boyd County*, No. 06-5407, 2008 WL 942042, at *6 (6th Cir. April 9, 2008) (a student's subjective belief that he would be disciplined for violating a school policy, not supported by any concrete act by the school board, did not constitute "injury-in-fact" needed for standing to pursue an as-applied first amendment claim).[31]

To the extent the claim is brought under the equal protection clause of the fourteenth amendment, the record does not supply any evidence in support of that claim. Plaintiffs claim that the yard sign enforcement by the City was "selective." Among the exhibits untimely submitted by Plaintiffs were a series of photographs apparently aimed at showing that others had yard signs. These exhibits have been stricken; however, even if they had been considered, the Court fails to see

---

[30] It remains to be proven, with respect to Claim 1, whether the defendants *retaliated* against the Briners for exercising their free speech rights; however, that would not be the same as being outrightly deprived of their right to speak freely. Furthermore, Claim 8 is not pled as a retaliation claim. Therefore, the Court does not construe the allegations of Claim 8 as part of the first amendment retaliation claim contained in Claim 1.

[31] In *Morrison*, a student alleged that a high school's written policy prohibiting students from making stigmatizing or insulting comments regarding another student's sexual orientation "chilled" his right to speak out against the school's chapter of the Gay Straight Alliance. Based on his subjective belief that he would be punished if he spoke out, the student remained silent with respect to his personal belief that homosexuality is a sin, but filed a federal lawsuit against the school board seeking nominal damages. The Sixth Circuit affirmed the grant of summary judgment to the Board. In the instant case, plaintiffs are seeking compensatory and punitive damages, not nominal damages. Since there was no injury, due to the fact that the yard signs were never removed, the Court fails to see what needs to be compensated, i.e., made whole, especially since the first amendment *retaliation* claim has survived summary judgment.

their relevance. All of the photographs show yard signs that amounted to advertising. There were no political signs which might be used to compare content to see if the Briners' content was being challenged whereas similar content on other signs was not challenged.

In view of this discussion, Claim 8 does not survive summary judgment.

### The Supplemental State Law Claims

The supplemental state law claims are: malicious prosecution (related to Claim 2, now dismissed); intentional infliction of emotional distress; civil conspiracy (related to Claim 4, now dismissed); defamation (related to Claim 6, now dismissed); invasion of privacy (which is similar to a first amendment claim, which has survived); tortious interference with contracts; and tortious interference with business interests. Because these supplemental state law claims do not add anything to the federal claims and because the federal claims have mostly been dismissed, this Court **DECLINES JURISDICTION** under 28 U.S.C. § 1367(c)(3).

There are also unspecified violations of the Ohio Constitution. Because there is no specificity with respect to any violation of the Ohio Constitution, to the extent there are any such claims in this complaint, they are **DISMISSED**.

## III.

## CONCLUSION

The Court **DENIES** Plaintiffs' motion for oral argument. (Doc. No. 108.) The Court **GRANTS** Defendants' motions to strike Plaintiffs' exhibits submitted as Doc. No. 91. (Doc. Nos. 93, 96 and 97.) The Court *sua sponte* strikes Doc. No. 92.[32]

As set forth in the discussion above, the Court rules as follows with respect to the First Amended Complaint (Doc. No. 42):

(1)     Defendant Charles Au is **DISMISSED WITH PREJUDICE** upon stipulation (Doc. No. 77);

(2)     Defendants Richard Bevier and Riley E. Snavely are **DISMISSED WITHOUT PREJUDICE** upon stipulation (Doc. No. 78);

(3)     Claim 6 is **DISMISSED** for failure to plead with specificity;

(4)     the Court **DECLINES JURISDICTION** over all supplemental state law claims pursuant to 28 U.S.C. § 1367(c)(3); and

(5)     any claims brought pursuant to the Ohio Constitution are **DISMISSED** for failure to plead with specificity.

Specifically with respect to the motions for summary judgment, the Court rules as follows:

(1)     Plaintiffs' motion for partial summary judgment against Defendant McClaran for removal from the City towing list (Doc. No. 69) is **DENIED**;

(2)     Plaintiffs' motion for summary judgment on their first amendment claims (Doc. No. 73) is **DENIED**;

---

[32]     The fact that these exhibits have been stricken for purposes of summary judgment has no bearing on their admissibility at trial.

(3)     Defendants' motions for summary judgment (Doc. Nos. 55 and 75) are **GRANTED IN PART AND DENIED IN PART**. No claims remain against Defendant Hill, who is dismissed with prejudice. The only claim remaining for trial is a portion of Claim 1 (asserting a first amendment retaliation claim against the City and McClaran relating to removal of F&W Towing from the City's towing list). If McClaran is found liable on the first amendment claim, municipal liability will attach.

## IV.

## SUBSEQUENT PROCEEDINGS

In view of the above rulings, the Court will proceed with the Final Pretrial Conference set for 4:30 p.m. on Monday, April 21, 2008 and with the jury trial set on a standby basis for the two-week period beginning May 19, 2008.


**IT IS SO ORDERED**.

Dated: April 16, 2008                          _____
                                               **HONORABLE SARA LIOI**
                                               **UNITED STATES DISTRICT JUDGE**

33